# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

RICKEY BRADLEY,             )
                                  )
              **Plaintiff,**      )
                                  )
             **v.**            )    No. 15 C 8107
                                  )
**CAROLYN W. COLVIN, Acting**     )    **Magistrate Judge Sidney I. Schenkier**
**Commissioner of the U.S. Social**    )
**Security Administration,**         )
                                  )
              **Defendant.**     )

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff Rickey Bradley has filed a motion seeking reversal of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits ("DIB") under Sections 216(i) and 223(d) of the Social Security Act (doc. # 9). The Commissioner has filed her own motion seeking affirmance of the decision denying benefits (doc. # 11). For the following reasons, Mr. Bradley's motion is denied and the Commissioner's motion is granted.

### I.

Mr. Bradley applied for benefits on April 12, 2012, alleging he became disabled on November 26, 2011 due to the effects of a stroke and hypertension (R. 42, 52, 156-62). His date last insured is December 31, 2016 (R. 176). The application was denied initially on August 24, 2012, and upon reconsideration on December 5, 2012 (R. 42-70, 91-95, 98-101). Mr. Bradley, represented by counsel, appeared and testified before administrative law judge ("ALJ") Patrick Nagle on March 20, 2014 (R. 13-41). Vocational expert ("VE") Karen Schneider also testified

---

[1] On November 3, 2015, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (docs. ## 5, 6).

(R. 31-39). On April 4, 2014, the ALJ issued a decision finding that Mr. Bradley was not disabled and denying his claim for benefits (R. 74-90). The Appeals Council denied Mr. Bradley's request for review on July 16, 2015, making the ALJ's decision the final decision of the Commissioner (R. 1-6). *See Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).

## II.

We begin with a summary of the administrative record. Part A reviews Mr. Bradley's medical history, Part B reviews the hearing testimony, and Part C summarizes the ALJ's opinion.

## A.

Mr. Bradley was born on June 24, 1961 and was 52 years old at the time of the hearing (R. 178). Mr. Bradley completed high school and one year of college (R. 182). Mr. Bradley's past work includes working as a crane operator and a machine operator.

On March 27, 2010, Mr. Bradley visited the emergency room at the University of Chicago Medical Center, complaining of acute onset left-sided weakness (R. 281). Mr. Bradley's symptoms included focal weakness, loss of sensation, loss of balance, and speech change (R. 279). The emergency room physician diagnosed Mr. Bradley with a "likely stroke" (R. 280). During his hospitalization, Mr. Bradley was put on prescription medications for uncontrolled hypertension (R. 268). On April 5, 2010, while Mr. Bradley was still in the hospital, a lower extremity Doppler examination was performed which showed an acute deep vein thrombosis ("DVT") (R. 351, 353). An inferior vena cava ("IVC") filter was placed on April 5, 2010 (R. 351).

On April 6, 2010, Mr. Bradley was transferred to Schwab Rehabilitation Hospital ("Schwab") for comprehensive rehabilitation, including physical therapy, occupational therapy, speech therapy, and psychological counseling (R 268). On April 11, 2010, Mr. Bradley was

transferred to Mercy Hospital for further workup due to acute renal failure (R. 348). Mr. Bradley's renal function improved with IV hydration (*Id.*). On April 14, 2010, a bilateral DVT was found (R. 345). Mr. Bradley underwent a thrombectomy and thrombolysis on April 26 and 27, 2010 at the University of Chicago Medical Center (*Id*). Because of his history of DVTs and clotting around the IVC filter, Mr. Bradley was placed on life-long anticoagulation therapy (R. 645). On April 30, 2010, Mr. Bradley was transferred back to Schwab and was finally discharged to return home on May 21, 2010 (R. 343).

Between July 12, 2010 and October 4, 2012, Mr. Bradley visited internist Angela Weingarten. M.D. and her colleagues at the University of Chicago Medical Center's Primary Care Group Clinic, including Dr. Catherine Glunz, thirteen times for follow-ups on his multiple medical problems, including history of stroke, hypertension, extensive DVTs, and hyperlipidemia (R. 295-301, 319-27, 330-35, 642-48, 656-659). On July 12, 2010, Mr. Bradley saw Dr. Weingarten for the first time. Dr. Weingarten wrote that Mr. Bradley reported that he was doing well and was regaining his strength (R. 342). Mr. Bradley had no specific complaints (*Id.*). Dr. Weingarten noted that Mr. Bradley required a cane to walk (R. 343). Mr. Bradley's sensation on the left was slightly decreased as compared to the right, and his upper extremity had slightly decreased sensation compared to his left lower extremity (*Id.*). Mr. Bradley's strength was also slightly decreased on the left as compared to the right in both upper and lower extremities (*Id.*). Dr. Weingarten was concerned about Mr. Bradley's blood pressure and doubled his blood pressure medication dosage (R. 343-44). Dr. Weingarten directed Mr. Bradley to follow-up in one month to confirm that his hypertension was under control (R. 344).

On August 6, 2010, during a follow-up visit with Dr. Gioia Herring at Schwab, Mr. Bradley reported that he had been doing fairly well since his discharge from his inpatient

3

rehabilitation stay (R. 272). Mr. Bradley also stated that he completed his outpatient therapies, including physical therapy, occupational therapy, and speech therapy (*Id.*). Mr. Bradley was ambulating with a cane (*Id.*). Dr. Herring noted that Mr. Bradley's primary care physician, Dr. Benitez, released him to return to work on September 1, 2010 at a reduced schedule with work restrictions (*Id*). A manual muscle test of Mr. Bradley's upper extremities revealed essentially 5/5 strength except for his hand grasp on the left side which was -5 (R. 273). A manual muscle test of the lower extremities revealed strength to be 5/5 on the right lower extremity and -5/5 on the left (*Id*). Mr. Bradley's ambulation with an assistive device showed a decreased heel-to-toe gait pattern and decreased knee flexion with his gait (*Id.*). Dr. Herring determined that Mr. Bradley was doing fairly well and directed him to follow-up in six months for a recheck (*Id.* at 273).

On August 26, 2010, Mr. Bradley visited Dr. Kenneth J. Lee at the University of Chicago Medical Center's Neurology Clinic (R. 335-38). Dr. Lee noted that Mr. Bradley was doing very well since his discharge from rehabilitation (R. 336). Dr. Lee wrote that Mr. Bradley had very good mobility, used a cane sporadically, and had been able to use his left arm very well (*Id.*). Upon examination, Mr. Bradley had 5/5 strength in the right upper and lower extremities (R. 337). On the left side, Mr. Bradley had a mild pronator drift on the upper extremity but was 5/5 strength in the deltoids and triceps and 5-/5 in the biceps, wrist extensor, and wrist flexors (*Id.*). On the left lower extremities, Mr. Bradley had 5/5 strength in the hip extensor, hip flexors, dorsiflexors, and the plantar flexores and 5-/5 in the knee extensor and knee flexores (*Id.*). Mr. Bradley had a mildly unsteady and a slightly spastic gait with increased spasticity on the left side (R. 337). Mr. Bradley was able to do plantar flexion (*Id.*). Dr. Lee prescribed Tizanidine 2 mg as needed for Mr. Bradley's spasticity (*Id.*).

4

At his third visit with Dr. Weingarten on September 8, 2010, Mr. Bradley had 5/5 strength on his right side and 4/5 strength in his left upper and lower extremities (R. 334). Dr. Weingarten referred Mr. Bradley for a physical therapy evaluation and treatment for his increased spasticity (*Id.*). At his next appointment with Dr. Weingarten on October 19, 2010, Mr. Bradley reported that he was feeling much better and his arm was less stiff and uncomfortable since he began physical therapy (R. 330-31). Dr. Weingarten noted that she wrote a letter to Mr. Bradley's employer explaining that he was unable to lift weight above five to seven pounds and was unable to stand for extended periods of time without sitting (R. 331).

On January 6, 2011, Mr. Bradley returned to the University of Chicago Medical Center's Neurology Clinic for a follow-up appointment with Dr. Lee (R. 327-30). Dr. Lee noted that since Mr. Bradley's last visit in August 2010, he had been doing very well (R. 327). Mr. Bradley reported that he was on Tizanidine 2 mg and doing exercises at home (*Id.*). As a result, the spasticity and throbbing pain in Mr. Bradley's left arm and leg had improved greatly (*Id.*). Mr. Bradley had 5/5 strength in the right upper and lower extremities (R. 328). He had approximately 5-/5 strength in his left upper and lower extremities (*Id.*). Mr. Bradley had a spastic stance as well as a spastic gait (*Id.*). Dr. Lee directed Mr. Bradley to continue to exercise and take Tizanidine as needed (R. 329). Dr. Lee noted that Mr. Bradley was doing well neurologically and did not need to schedule another neurology clinic visit (*Id.*).

At his February 15, 2011 appointment with Dr. Weingarten, Mr. Bradley reported that he was not back to his baseline from before his stroke, but his spasticity was not bothering him nearly as much and he was doing better (R. 325). Dr. Weingarten wrote that she was not comfortable releasing Mr. Bradley to return to work without a functional capacity test (*Id.*). On March 14, 2011, Mr. Bradley visited with Dr. Weingarten and reported that he completed his

functional capacity testing and planned to return to work on March 16, 2011 (R. 322). Mr. Bradley reported that his weakness and spasticity had improved (R. 323). Mr. Bradley was given a return to work note (R. 324).

On July 1, 2011, Mr. Bradley returned to Dr. Weingarten and reported a burning sensation in his left hand and foot (R. 320). Mr. Bradley stated that the pain was "really bothering him while at work" (*Id*). Dr. Weingarten prescribed Gabapentin 100 mg 3 times daily for his paresthesias (R. 321). Dr. Weingarten also gave Mr. Bradley a referral for further workup due to his persistent hypertension (*Id.*).

On August 16, 2011, Mr. Bradley saw Colleen Flynn, M.D. at the University of Chicago Medical Center's Endocrinology Center for a hypertension consultation at Dr. Weingarten's request (R. 317-19). Mr. Bradley reported that he had been on medications for his hypertension for approximately five years, but his blood pressure has never been well controlled (R. 318). Mr. Bradley stated that he experienced left leg swelling at the end of his workday (*Id.*). Dr. Flynn noted that Mr. Bradley had a gait with a slight limp favoring his left leg and 5/5 strength on both sides upper and lower extremities (R. 318-19). Regarding Mr. Bradley's high blood pressure, Dr. Flynn added chlorthalidone 25 mg daily, nifedipine 120 mg XL every evening, bisoprolol 20 mg every evening, and Edarbi 80 mg daily and stopped his hydralazine, amlodipine and metoprolol (R. 319). Mr. Bradley saw Dr. Flynn again on September 27, 2011 for hypertension management and she adjusted his high blood pressure medications (R. 315-17).

On September 29, 2011, Mr. Bradley saw Jennifer McDonnell, M.D. at the University of Chicago Medical Center's Medicine and Pediatrics Clinic (R. 312-15). Mr. Bradley reported difficulty with his work conditions (R. 312-313). Mr. Bradley explained that he stood all day as he drove a silo and stacked cut metal bars which weighed approximately thirty to forty-five

pounds (R. 313). Mr. Bradley stated that standing all day exacerbated his numbness and tingling and his left leg swelled by the end of the day (*Id.*). Mr. Bradley reported that he was independent in his activities of daily living and instrumental activities of daily living (R. 314).[2] Mr. Bradley had 5/5 strength in his right upper extremities and 4/5 strength in his left upper extremities (*Id.*). In his lower extremities, he had 5/5 strength on the right and 4/5 strength in his quadriceps and calf muscle on the left (*Id.*). Mr. Bradley's sensation was intact bilaterally but Mr. Bradley reported a subjective feeling of numbness in his arm and leg on the left side as well as a lot of tingling and burning (*Id.*). Dr. McDonnell concluded that Mr. Bradley's job was exacerbating his symptoms of neuropathy and leg swelling (R. 314). She stated that he would do better in a job where he was not on his feet all day and not lifting heaving objects (*Id.*). Dr. McDonnel added: "I think ideally it would be nice if the patient could retain . . . a different job in the same company as the patient is still functional in his IADLs and ADLs and would be able to do other things, such as his old job of driving as a crane operator" (*Id.*).

Mr. Bradley visited Dr. Lee on November 18, 2011 at the University of Chicago Medical Center's Neurology Clinic for new symptoms of head pressure (R. 301-04). Upon examination, Mr. Bradley had 5/5 strength in the right upper and lower extremity (R. 303). On the left upper extremity, Mr. Bradley had 5/-5 in his arm flexion as well as his wrist extension (*Id*). Mr. Bradley had 5/5 strength in his left arm flexors (*Id.*). Mr. Bradley had increased tone in his left upper and lower extremities with some mild spasticity (*Id.*). Mr. Bradley had a mildly spastic gait but was able to ambulate without assistance (*Id*). Dr. Lee wrote that Mr. Bradley's post-stroke symptoms had been stable and he was doing well in terms of his rehabilitation on his left

---

[2] Activities of daily living are basic self-care tasks such as bathing, dressing, feeding, toileting, walking, and hygiene. Instrumental activities of daily living are more complex tasks associated with independent living such as cooking, cleaning, shopping, handling transportation, paying bills, using a telephone, and managing medications. *McNeill v. Astrue*, 2013 WL 865621, at *9 n.12 (E.D.N.C. Feb. 20, 2013) (citing Leslie Kernisan, M.D., & Paula Spencer Scott, *Activities of Daily Living: What are ADLs and IADLs?*, http://www.caring.com/articles/activities-of-daily-living-what-are-adls-and-iadls).

side (R. 303). Dr. Lee was not concerned about Mr. Bradley's new symptoms of head pressure and recommended Tylenol and ice packs to relieve pressure (*Id.*).

On December 19, 2011, Mr. Bradley reported to Dr. Weingarten that he did not think he could continue performing such a physically demanding job at his employer (R. 299). Mr. Bradley stated that he was working in the "shop" and he was required to stand all day and lift heavy loads (*Id.*). He said that after work he was in an incredible amount of pain and had left lower extremity swelling (*Id.*). Dr. Weingarten wrote a letter to Mr. Bradley's employer requesting accommodations (R. 299-300). By his next appointment on January 10, 2012, Mr. Bradley had stopped working and was receiving temporary disability (R. 297-98). Mr. Bradley reported that his left arm pain had gotten a little better since he stopped working, but had not completely subsided (*Id.*). At his March 6, 2012 appointment with Dr. Weingarten, Mr. Bradley stated that he still had neuropathic pain and numbness and tingling in his left hand and foot, but he felt better than when he was working (R. 295). At his May 22, 2012 appointment, Dr. Weingarten noted that Mr. Bradley's blood pressure continued to be elevated and she deferred to Dr. Bakris in the Endocrinology Clinic for the best way to manage Mr. Bradley's blood pressure (R. 658). Dr. Weingarten noted that Mr. Bradley's cholesterol levels had improved and he was close to reaching his target for a reduced cholesterol level (R. 658-59).

Mr. Bradley returned to the University of Chicago Medical Center's Endocrinology Clinic for a hypertension management follow-up appointment on April 19, 2012 (R. 290-91). Mr. Bradley reported that he was measuring his blood pressure at home using a wrist cuff, watching the sodium in his diet, and exercising by weight lifting (R. 290). Mr. Bradley stated that his morning blood pressure range was between 160-180/95 and that he used less than 20 pounds of upper body weights (*Id*). On physical examination, Mr. Bradley's blood pressure

sitting was 102/70 with a pulse of 68 and standing was 120/60 with a pulse of 60 (*Id.*). Dr. Flynn noted that Mr. Bradley's goal blood pressure was less than 130/80 with a resting heart rate of less than 80 (R. 290-91). Dr. Flynn directed Mr. Bradley to continue his bisoprolol 20 mg and chlorthalidone 25 mg every morning, add amilordie 10 mg every morning and nifedipine XL 90 mg in the evening, continue his low-sodium diet, get adequate sleep, get a new blood pressure machine with an arm cuff, check his blood pressure in the morning before taking his medication, and follow up with his primary care doctor (R. 291).

On May 10, 2012, Mr. Bradley visited Dr. Weingarten for a hypertension follow-up exam (R. 291-94). Mr. Bradley reported that his blood pressure at home had been running in the 120s/80s and he continued to be active and watch his salt intake (R. 292). Dr. Weingarten noted that Mr. Bradley continued to complain of numbness, pain, and weakness (*Id.*). Mr. Bradley also reported that he continued to have burning neuropathy in his hands and feet on the left side of his body as well as weakness and spasticity on that side (R. 293). Mr. Bradley stated that he was not taking his Gabapentin even though it was recommended at his last appointment that he increase his Gabapentin to three times a day for paresthesia (R. 292). Mr. Bradley stated that instead he "just deals with the pain" (*Id*). Upon examination, Mr. Bradley's blood pressure was 140/85 and his pulse was 80 (R. 293). Dr. Weingarten observed that Mr. Bradley had numbness on the left side of his face with a slight facial droop on that side (*Id.*). Mr. Bradley's blood pressure was elevated (R. 293). Dr. Weingarten noted Mr. Bradley's follow-up appointment with Dr. Bakris on April 17, 2012 and deferred to him on the best way to manage Mr. Bradley's blood pressure (*Id.*).

On June 7, 2012, Mr. Bradley and his fiancée, Charlene Golden, completed a function report for the Bureau of Disability Determination Services ("DDS") (R. 189-97). Mr. Bradley

reported left-sided weakness since his stroke (R. 189). Mr. Bradley described his daily activities as getting up, bathing, getting help with breakfast, exercising, laying down, getting back up, getting ready for dinner, watching TV, and going to bed (R. 190). Mr. Bradley reported no problem with personal care except he cannot button his shirt, washes with one hand, and sits down to wash his feet (*Id*.). Mr. Bradley wrote that he can do laundry but cannot iron, do household repairs, or mow the lawn (R. 191). He stated that he goes outside two to three times a week and does not drive because of left-side weakness (R. 192). Mr. Bradley shops for food and personal items once a month and goes to the doctor once or twice a week (R. at 192-93). Mr. Bradley wrote that he can walk two or three blocks before having to stop and rest a few minutes, can sit for two hours without having to get up to stand or walk, needs to take a rest period during the day, has difficulty reaching overhead or above waist level on his left side, and does not handle stress or change in routine well (R. 194-95, 198-99). Mr. Bradley reported that he has used a cane, brace, and splint on a daily basis since his stroke (R. 195).

On August 8, 2012, Dr. Rochelle Hawkins conducted a consultative examination of Mr. Bradley for DDS (R. 666-74). Mr. Bradley described left sided weakness and paresthesia and a burning sensation in his left arm and bottom of his foot since his stroke (R. 666). Mr. Bradley stated that he was unable to exercise much because of pain (*Id*.). Dr. Hawkins noted that there was no limitation of motion of shoulder, elbow, or wrist joints (R. 667). Mr. Bradley's fist and grip strength was 5/5 on the right and 4/5 on the left (R. 667-68). Mr. Bradley was able to perform manipulations with either hand without difficulty (R. 668). Mr. Bradley had muscle strength of 5/5 on the right and 4/5 on the left in his upper and lower extremities (*Id*.). A straight leg raising test was accomplished on the right and was 90 degrees on the left (*Id*.). There was normal sensation to pin prick and touch over both arms and legs but Mr. Bradley complained of

burning sensation in his left hand and foot (*Id.*). Dr. Hawkins noted that Mr. Bradley walked with a limp favoring his left side (*Id.*). Mr. Bradley had a cane but was able to walk 50 feet without it (*Id*). Mr. Bradley had mild difficulty walking on his toes and heels and squatting and arising and moderate difficulty hopping on one leg (*Id.*). Dr. Hawkins concluded that Mr. Bradley could sit, speak, or hear without difficulty but has "some difficulty in prolonged standing, walking, lifting and carrying due to left sided weakness and burning sensation in left hand and food" (R. 669).

On August 23, 2012, Dr. Charles Wabner completed a physical Residual Functional Capacity ("RFC") assessment of Mr. Bradley (R. 46-48). Dr. Wabner opined that Mr. Bradley could occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds; stand, walk and/or sit for a total of six hours in an eight-hour workday; push and/or pull unlimited; occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl; never climb ladders, ropes, or scaffolds; should avoid moderate exposure to extreme cold and heat; and should avoid concentrated exposure to hazardous machinery (*Id.*). Dr. Calixto F. Aquino, Jr. affirmed Dr. Wabner's findings on December 4, 2012 (R. 56-58). Another state agency physician, Dr. Mila Bacalla, reviewed the record on December 17, 2012 and concurred with Dr. Aquino (R. 61-70).

On September 18, 2012, Mr. Bradley visited with Dr. Weingarten and reported that his neuropathic pain had become more bothersome recently especially when walking. Dr. Weingarten increased his Gabapentin from 100 mg three times a day to 200 mg three times a day (R. 645, 647). Dr. Weingarten noted that Mr. Bradley's hypertension was now well controlled (R. 645). At his next appointment with Dr. Weingarten on October 4, 2012, Mr. Bradley reported that following the increase in his dose of Gabapentin, his pain improved but had gotten worse over the past couple of weeks (R. 642). Mr. Bradley requested to increase his dose of the medication (*Id*). Dr. Weingarten increased the dose of Gabapentin to 300 mg three times a day

(R. 644). Dr. Weingarten also noted that Mr. Bradley's hypertension remained well controlled (R. 642).

Mr. Bradley saw Thomas J. Kelly, M.D., at the University of Chicago Medical Center on October 9, 2012 complaining of an abnormal sensation in his left face, arm, and leg since his stroke in 2010 that had been getting progressively worse and interfered with his daily activity (R. 638). Mr. Bradley reported that he received some symptomatic relief from taking Gabapentin 300 mg three times a day, but that the medication did not relieve his pain completely (*Id.*). He also tried Tylenol with minimal relief (*Id.*). Upon examination, Mr. Bradley had 5/5 strength in the right upper and lower extremities and 4+/5 in the left upper and lower extremities (R. 641). Dr. Kelly noted some increased tone in Mr. Bradley's left upper extremities as well as his left lower extremities with some mild spasticity (*Id.*). However, Mr. Bradley was able to overcome his spasticity and move his fingers and arm on the left side freely (*Id.*). Mr. Bradley had a mildly spastic gait but was able to ambulate without assistance (*Id.*). Dr. Kelly increased Mr. Bradley's dose of Gabapentin from 300 mg three times a day to 600 mg three times a day (*Id.*). Dr. Kelly noted that Mr. Bradley was able to overcome his spasticity and had a full range of motion for the left upper and lower extremities (*Id.*).

On November 23, 2012, Ms. Golden helped Mr. Bradley complete a second function report for DDS. Mr. Bradley reported difficulties with personal care tasks, such as buttoning clothes, washing his back, bending over to bathe, cutting his hair, and shaving without help (R. 218). Mr. Bradley wrote that he does not prepare meals and is not able to do any household chores because of left side weakness (R. 219-220). Mr. Bradley stated that he sits on his porch every other day and does not drive (R. 220). Mr. Bradley wrote that he does not shop (*Id.*). He goes to the doctor two or three times a month (R. 221). In addition, Mr. Bradley stated that he

can walk two blocks before needing to stop and rest for ten minutes, can sit for two hours without having to stand or walk, and needs to take rest periods during the day (R. 222, 227). Mr. Bradley indicated that he uses a cane, brace, splint, and wheelchair on a daily basis (R. 223).

Catherine Glunz, M.D., completed an Attending Physician's Statement of Impairment and Function questionnaire on March 7, 2013 (R. 676-77). Dr. Glunz described Mr. Bradley's symptoms as left sided weakness, spasticity, and neuropathic pain (R. 676). Dr. Glunz noted that she first saw Mr. Bradley on July 12, 2010 and advised him to stop working due to his condition on November 26, 2011 (*Id.*). Dr. Glunz opined that Mr. Bradley could perform sedentary activity for eight hours in an eight-hour workday and light activity for two hours in an eight-hour workday (R. 677). Dr. Glunz concluded that Mr. Bradley could lift fifteen pounds and bend, climb, reach, kneel, squat, crawl, and push/pull occasionally (*Id.*). Dr. Glunz noted that Mr. Bradley's spasticity and weakness in his left upper extremity would cause some functional limitations (*Id.*).

On May 15, 2013, Mr. Bradley began seeing Dr. Sashil Kapur at Mile Square Health Center, a free clinic, as his health insurance terminated when he was fired on February 14, 2013 (R. 690).[3] Dr. Kapur diagnosed benign hypertension, hyperlipidemia, and history of stroke (R. 692). Mr. Bradley reported his pain as a zero out of ten (*Id.*). Mr. Bradley's blood pressure was elevated but he stated that he gets normal levels at home (*Id.*). Dr. Kapur continued Mr. Bradley on his same hypertension medications (*Id.*). At his next appointment with Dr. Kapur on June 26, 2014, Dr. Kapur added a prediabetes diagnosis and discussed an appropriate diet with Mr. Bradley (R. 688). Mr. Bradley rated his pain at a zero out of ten (*Id*). Mr. Bradley's blood

---

[3] Effective February 14, 2013, Mr. Bradley was terminated from his employment when his temporary disability benefits ceased and his employer determined that he was unable to safely return to work with or without reasonable accommodations (R. 675).

pressure was mildly elevated but he again reported that he gets normal levels at home (*Id.*). At a follow-up visit with Dr. Kapur on October 2, 2013, Mr. Bradley reported continued burning sensation on his left side (R. 682). The pain was worse with walking and worse in his left hand and foot (*Id.*). Mr. Bradley stated that Gabapentin helps but he wanted to know how to decrease his pain further (*Id.*). Mr. Bradley's blood pressure was mildly elevated but he had not taken his medications that morning and continued to report that he gets normal levels at home (R. 682, 684). On January 9, 2014, Mr. Bradley reported burning on his left side which was worse with walking and worse in his left hand and foot (R. 678). Mr. Bradley reported that his pain at the appointment was zero out of ten (R. 680). Mr. Bradley's hypertension was well controlled and his A1C was stable (R. 680-81).[4] Dr. Kapur increased Mr. Bradley's Gabapentin dose from 600 mg three times a day to 900 mg three times a day (R. 681).

### B.

The ALJ held a hearing on March 20, 2014 (R. 13-41). Mr. Bradley testified that he suffered a stroke on March 27, 2010 and was in the hospital for approximately two months recovering (R. 22). As a result of his stroke, Mr. Bradley has had burning pain on his left side in his arm, shoulder, and leg (R. 20, 30). Mr. Bradley also stated that he gets tired easily since his stroke (R. 26).

Mr. Bradley testified that he returned to work for seven months after his stroke (R. 22). He reported that his employer removed him from his prior crane work but allowed him to work on the "Sunni saws" (*Id.*). Mr. Bradley stated that while working on the "Sunni saws," he was lifting twenty to twenty-five pounds with his right hand (*Id.*). Mr. Bradley testified that lifting that amount of weight with his right hand was causing increased pain to his left side (*Id.*). After

---

[4] The A1C test is a blood test that provides information about a person's average levels of blood glucose over the past three months. The A1C test is the primary test used for diabetes management. https://www.niddk.nih.gov/health-information/diabetes/diagnosis-diabetes-prediabetes/a1c-test.

seven months on the job, Mr. Bradley's doctor told him not to lift twenty to twenty-five pounds (*Id.*). Mr. Bradley stated that his doctor put him on a three-pound weight restriction and limited him to work which allowed him to sit for fifteen minutes every hour. (*Id.*). Mr. Bradley testified that his employer did not have any jobs available for him with his work restrictions and he last worked in November 2011 (R. 22-23). Mr. Bradley's health insurance was terminated in February 2013 (R. 24).

After his stroke, Mr. Bradley was advised to do stretching exercises to regain his strength on his left side (R. 24). Before his health insurance was terminated, Mr. Bradley attended physical therapy sessions (R. 24-25). The physical therapy provided temporary pain relief (R. 25). Mr. Bradley reported that he now uses a machine at home to stretch his left side (R. 25). Mr. Bradley takes 900 milligrams of Gabapentin three times per day for pain (R. 27, 29-30). Mr. Bradley testified that Gabapentin makes him sleepy (R. 27). Mr. Bradley stated that his condition has not improved since his stroke (R. 23). Mr. Bradley believes he is unable to work because of his limited ability to stand, lift, and walk (R. 19-20). Mr. Bradley testified that he could stand for fifteen to twenty minutes "before everything on my left side start[s] hurting" (R. 20). He can lift about five to ten pounds without his left side hurting (*Id.*). Mr. Bradley testified that he can walk a block before experiencing pain, getting tired, and needing to sit down (R. 21, 28-29). Mr. Bradley also testified that walking and being on his feet cause pain while sitting relieves his pain (R. 30). Mr. Bradley stated that he has difficulty walking up and down stairs (R.27).

Mr. Bradley lives by himself (R. 25). He has three children (ages seven, thirteen, and thirty-two at the time of the hearing) who do not live with him (R. 26). He visits with his children on weekends (*Id.*). Regarding his activities of daily living, Mr. Bradley testified that he stays at home most of the time (R. 26-27). Mr. Bradley said that his girlfriend makes him

breakfast which he reheats in the microwave (R. 26). Mr. Bradley then showers and watches TV until his girlfriend gets home from work (*Id.*). Mr. Bradley testified that his girlfriend makes him dinner or brings him dinner (*Id.*). Mr. Bradley stated that on a weekend in the summer, he and his girlfriend may take his daughter to the park (R. 28). Mr. Bradley testified that he goes out to eat "every now and then" and had not gone to a movie in years (*Id.*). Mr. Bradley stated that he does not drive often and never drives on the expressway (R. 28). At the time of the hearing, Mr. Bradley had not driven for a couple of months (*Id.*).

VE Karen Schneider testified by telephone that Mr. Bradley's past relevant work included industrial truck operator, metal cutoff saw operator, and hand packager, all performed at the medium exertional level (R. 31-32). The ALJ asked the VE a series of hypotheticals, each one assuming an individual of Mr. Bradley's age, education, and work experience (R. 32). In the first hypothetical, the ALJ asked the VE to consider an individual who can lift or carry twenty pounds occasionally, ten pounds frequently, can stand or walk for four hours out of an eight-hour workday, can sit for the other four hours out of an eight-hour workday, can occasionally climb ramps or stairs, balance, stoop or crouch, can never climb ladders, ropes, or scaffolds, cannot be exposed to extremes of cold or heat, and should not work with dangerous machinery with moving parts or at unprotected heights (R. 31-32). The VE testified that such an individual could not perform Mr. Bradley's past work (R. 33). The ALJ asked if there was other light work that such an individual could perform (*Id.*). The VE opined that such an individual would be able to perform the jobs of cashier (22,000 jobs), storage facility rental clerk (1,100 jobs), and routing clerk (1,300 jobs) (*Id.*).

The ALJ then asked a second hypothetical incorporating the same limitations as the first hypothetical but adding a limitation that the individual would be allowed to alternate sitting or

standing at will, provided that he or she would not be off task more than ten percent of the work period (R. 33-34). The VE responded that the individual could perform the jobs listed in response to the first hypothetical (R. 34). For the third hypothetical, the ALJ incorporated the same limitations as the second hypothetical and added the limitation that the individual would need two extra breaks of thirty minutes apiece due to fatigue (R. 35). The VE testified that there would be no jobs available for such an individual (*Id.*). The ALJ confirmed that the VE's testimony about available jobs was consistent with the Dictionary of Occupational Titles ("DOT"), her experience in job placement, and her job site observation (*Id.*).

Mr. Bradley's attorney then asked the VE whether a person who was limited to only occasional use of the left upper and lower extremities would be able to perform the three jobs identified by the VE (R. 36). The VE responded that the number of cashier position jobs would be reduced to approximately 7,000 and the number of storage facility rental clerk and routing clerk positions would not change (*Id.*). The ALJ asked if the individual in his second hypothetical was additionally limited to occasional use of their left arm for reaching and handling would that impact the jobs listed (*Id.*). The VE opined that the number of cashier jobs would be reduced to 7,000 and the number of storage facility rental clerk and routing clerk positions would not change (R. 36-37). Next, the ALJ asked the VE whether a person who was limited to frequent reaching and handling with their left arm could perform those jobs (R. 37). The VE said such an individual would be able to perform the original number of jobs she listed (22,000 cashier jobs, 1,100 storage facility rental clerk, and 1,300 routing clerk jobs) (*Id*).

Mr. Bradley's attorney asked if the jobs the VE listed would be available to an individual limited to two hours of standing or walking in an eight-hour workday (R. 37). The VE testified that the routing clerk position would be eliminated but such a person could perform the cashier

and storage facility rental clerk jobs (R. 37-39). The VE added that such an individual would also be able to perform the job of ticket taker (2,500 jobs) (R. 39). When asked about a person who would only be able to lift up to 15 pounds, the VE opined that such an individual would be able to perform the cashier, storage facility rental clerk, and routing clerk jobs (R. 38).

## C.

On April 4, 2014, the ALJ issued a written decision denying Mr. Bradley's claim for benefits. At Step 1 of the sequential evaluation, the ALJ found that Mr. Bradley had not engaged in substantial gainful activity since his alleged onset date of November 26, 2011 (R. 76). At Step 2, the ALJ determined that Mr. Bradley had severe impairments of hypertension, status post stroke, and obesity (R. 77). At Step 3, the ALJ found that Mr. Bradley's impairments or combination of impairments did not meet or medically equal a listed impairment, specifically considering Listing 11.04 (central nervous system vascular accident) and Listing 4.00(H)(1) (hypertension) (R. 78). The ALJ considered Mr. Bradley's obesity and found that the medical evidence did not reflect that his obesity elevated his other medically determinable impairments to meet a listing (*Id.*)

The ALJ determined that Mr. Bradley had the residual functional capacity ("RFC") to lift and carry up to twenty pounds occasionally and up to ten pounds frequently; to stand or walk for approximately four hours and sit for approximately four hours per eight-hour workday, with normal breaks and an option to alternative between sitting and standing; to occasionally climb ramps or stairs, stoop, or crouch; to frequently reach and handle with the left upper extremity; never to climb ladders, ropes, or scaffolds; never to kneel or crawl; and should avoid moderate exposure to extreme cold or heat and hazards such as unprotected heights and dangerous machinery with moving mechanical parts (R. 78).

The ALJ noted that Mr. Bradley had a stroke in March 2010 and required intense treatment to recover, including hospitalization, physical therapy, occupational therapy, speech therapy, and psychological counseling (R. 79-80). In explaining his RFC determination and finding that Mr. Bradley retains the ability to work, the ALJ noted: (1) the majority of Mr. Bradley's treatment occurred prior to his alleged onset date of November 26, 2011; (2) his treatment since then has been fairly routine and conservative; (3) his muscle strength in his left upper and lower extremities was only slightly reduced and he retained full range of motion in his left upper and lower extremities; (4) his anti-coagulation therapy levels were generally within the therapeutic range; (5) his blood pressure was often within normal limits at follow-up visits and when it was elevated, he reported obtaining normal readings at home; (6) his report of lifting weights of up to twenty pounds at home; and (7) his pain and burning sensation on his left side improved with Gabapentin (R. 79-82). In addition, the ALJ considered Mr. Bradley's treatment with Dr. Kapur at Mile Square Health Center since May 15, 2013 and determined that his follow-up visits every three to four months were usually for medication refills with no new complaints regarding his history of stroke and his hypertension was described as benign (R. 81-82).

The ALJ discussed Dr. Rochelle Hawkins's consultative examination of Mr. Bradley (R. 80-81). The ALJ noted Dr. Hawkins's examination of Mr. Bradley revealed full range of motion in the shoulders, elbows, wrists, ankles, knees, and hips (R. 80). Mr. Bradley's fist and grip strength was 5/5 on the right and 4/5 on the left, but he could perform manipulations with either hand without difficulty. (*Id.*). His muscle strength was 4/5 on the left and 5/5 on the right in both upper and lower extremities (*Id.*). The ALJ only gave "some weight" to Dr. Hawkins' assessment that Mr. Bradley has some difficulty in standing, walking, lifting, and carrying due to left-sided weakness and burning sensation in the left hand and foot because it was consistent

with her examination, but at the same time was "somewhat vague" regarding the severity of difficulties in standing, walking, lifting, and carrying (R. 82).

The ALJ considered the opinion of Mr. Bradley's treating physician, Dr. Glunz (R. 82). The ALJ also gave the opinion of Dr. Glunz "some weight," noting that Mr. Bradley had first seen Dr. Glunz on July 12, 2010 and thus had a long treatment relationship with Dr. Glunz (*Id.*). The ALJ reviewed Dr. Glunz's RFC, explaining that Dr. Glunz's opinion that Mr. Bradley could do sedentary activity for eight hours per workday and light activity for two hours per workday was "consistent" with the ALJ's RFC determination (*Id.*). The ALJ explained that Dr. Glunz's opinion was "somewhat unclear in places" because she did "not specify whether Mr. Bradley was reduced to sedentary work because of lifting or standing/walking issues, but my limitation to standing/walking 4 hours per day with the option to alternate incorporates Dr. Glunz's opinion" (*Id.*).

Next, the ALJ stated that he considered the opinions of the state agency medical consultants and gave them significant weight because they had an opportunity to review Mr. Bradley's longitudinal treatment record and their opinions were consistent with the objective medical evidence (R. 83). However, "considering the more recent evidence and the claimant's testimony, [the ALJ] further reduced his residual functional capacity, to accommodate the residual effects of [Mr. Bradley's] stroke, hypertension, and obesity" (*Id.*).

With respect to Mr. Bradley's credibility, the ALJ recognized that Mr. Bradley's consistent work history and his general compliance with treatment, improved diet, and exercise bolstered his credibility (R. 83-84). However, the ALJ found "his allegations and testimony not fully credible because the objective evidence does not support the severity of limitations alleged" (R. 84). The ALJ noted that Mr. Bradley worked after the alleged onset date, admitted receiving

unemployment benefits after the onset date, and received only routine and conservative treatment during the relevant period (R. 84). The ALJ recognized that Mr. Bradley lost his health insurance when he was fired, but noted that he was able to establish regular treatment at Mile Square Health Center thereafter (*Id.*). The ALJ found that Mr. Bradley's most recent treatment records did not support the severity of his alleged symptoms (*Id.*). The ALJ also noted that Mr. Bradley's pain, spasticity and other symptoms improved with medication. (*Id*). The ALJ considered that Mr. Bradley had previously used a cane but noted that more recent treatment records did not reflect the need for an assistive device (*Id.*). The ALJ noted that Mr. Bradley's most recent treatment record from January 2014 reflected a pain rating of 0 out of 10 and gave no indication that he required an assistive device for ambulation (*Id.*). The ALJ found that the medical record documented some continued left-side weakness with his motor strength generally between 4 and 5+ [sic] out of 5 on the left side but noted that Mr. Bradley is right-handed (*Id*). The ALJ pointed out that despite Mr. Bradley's left-sided weakness and spasticity, his doctors have noted full range of motion (*Id.*).

Given his RFC determination, at Step 4, the ALJ found that Mr. Bradley could not perform his past work of industrial truck operator, metal cut-off saw operator, and hand packager because it was at the medium exertional level (R. 84-85). At Step 5, the ALJ determined that Mr. Bradley retains the RFC to perform the requirements of a cashier, storage facility rental clerk, and routing clerk (R. 86).

## II.

"We review the ALJ's decision deferentially only to determine if it is supported by substantial evidence." *Yurt v. Colvin*, 758 F.3d 850, 856 (7th Cir. 2014). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

(*Id.*) (internal citations and quotations omitted). "Although we will not reweigh the evidence or substitute our own judgment for that of the ALJ, we will examine the ALJ's decision to determine whether it reflects a logical bridge from the evidence to the conclusions sufficient to allow us, as a reviewing court, to assess the validity of the agency's ultimate findings and afford [the claimant] meaningful judicial review." *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014).

Mr. Bradley argues that the ALJ made four reversible errors requiring remand. First, Mr. Bradley contends that the ALJ erroneously gave more weight to the opinions of the state agency physicians than to those of his treating physician and the consulting examining physician. Second, Mr. Bradley argues that the ALJ's credibility finding lacks evidentiary support. Third, Mr. Bradley contends that the ALJ impermissibly constructed a "middle ground" RFC. Fourth, Mr. Bradley argues that the VE's testimony was not consistent with the DOT. For the reasons stated below, we agree that the ALJ committed certain errors but conclude that none requires reversing the ALJ's determination.

### A.

Mr. Bradley argues that the ALJ erroneously gave more weight to the opinions of the non-examining state agency physicians, Drs. Wabner and Aquino, than he did to the opinions of his treating physician, Dr. Glunz, and the consulting examining physician, Dr. Hawkins. We agree that the ALJ did not give good reasons based on substantial evidence for discounting Dr. Glunz's opinion and improperly weighed the medical opinion evidence, but that his error was harmless.

An ALJ must give controlling weight to a treating physician's opinion if the opinion is supported by "medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2). When an ALJ declines to give a treating physician's opinion controlling weight, he or she must still assign a weight to that opinion considering such factors as "the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of test performed; and the consistency and support for the physician's opinion." *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010); 20 C.F.R. § 404.1527(c). An ALJ must give "good reasons" for the weight he or she gives a treating source's opinion. 20 C.F.R. § 404.1527(c)(2). In addition, an ALJ generally gives more weight to the opinion of a physician who has examined the claimant than to the opinion of reviewing consultants who have not examined the claimant. 20 C.F.R. § 404.1527(c)(1). An ALJ may discount the opinion of an examining physician if he adequately explains his reasons for doing so. *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) (stating "[a]n ALJ can reject an examining physician's opinion only for reason supported by substantial evidence in the record . . . .").

The ALJ considered the length, nature, and extent of Dr. Glunz's treatment relationship with Mr. Bradley, stating that Dr. Glunz treated Mr. Bradley since July 2010 and saw Mr. Bradley every two weeks for anti-coagulation management (R. 82). The ALJ gave "some weight" to Dr. Glunz's opinion because she was a treating source with a long relationship with Mr. Bradley (*Id.*). The ALJ credited Dr. Glunz's opinion that Mr. Bradley would have some functional limitations due to spasticity and weakness by limiting Mr. Bradley to frequent reaching and handling with the left upper extremity (R. 82-83). However, in discounting Dr. Glunz's opinion, the ALJ stated that the opinion "is somewhat unclear in places" because "Dr. Glunz does not specify whether [Mr. Bradley] is reduced to sedentary due to lifting or standing/walking issues" (R. 82). The ALJ concluded that his RFC determination was consistent

23

with Dr. Glunz's opinion that Mr. Bradley could do sedentary activity for 8 hours per workday and light activity for 2 hours per workday (*Id.*). The ALJ further noted that his limitation to "standing/walking 4 hours per day with the option to alternate incorporates Dr. Glunz's opinion." (*Id.*). The ALJ also rejected Dr. Glunz's opinion that Mr. Bradley is limited to lifting 15 pounds as being inconsistent with Mr. Bradley's self-report that he lifts less than 20 pounds of upper body weights (R. 83).

The ALJ's decision to disregard Dr. Glunz's opinion regarding Mr. Bradley's ability to stand and walk is problematic. The ALJ noted that Dr. Glunz indicated that Mr. Bradley would be limited to two hours of light activity per day but then concluded that his "limitation to standing/walking 4 hours per day with the option to alternate [between sitting and standing] incorporates Dr. Glunz's opinion" (R. 82). The ALJ also found that his RFC's limitation to standing/walk four hours per workday was "consistent" with Dr. Glunz's opinion that Mr. Bradley could do sedentary activity for eight hours per workday and light activity for two hours per workday (*Id.*). The ALJ did not explain, and it is not evident, how someone who is limited to two hours of light work per workday could be expected to stand or walk for up to four hours per workday. Nor does the Commissioner contend that affording "an option to alternate between sitting and standing" is the equivalent of or includes a standing or walking for two hours limitation. The Commissioner concedes that "the ALJ's RFC assessment is not identical to Dr. Glunz's opinion, [and] for that reason, the ALJ's description of the RFC as 'consistent' with Dr. Glunz's opinion overstates the case" (Def.'s Br. at 3). Because the ALJ's reason for disregarding Dr. Glunz's standing/walking restriction was based upon the ALJ's unexplained conclusion that standing or walking four hours per day with the option to alternate between sitting and standing

is consistent with light activity for two hours per workday, the ALJ's sole stated basis for rejecting Dr. Glunz's restriction is not valid and does not satisfy the "good reasons" standard.

The ALJ also provided an insufficient reason for declining to give controlling weight to Dr. Glunz's assessment of Mr. Bradley's limitations in his ability to lift. Dr. Glunz opined that Mr. Bradley was limited to lifting fifteen pounds (R. 677). In rejecting Dr. Glunz's opinion limiting Mr. Bradley to lifting fifteen pounds, the ALJ noted that Mr. Bradley "himself reported lifting up to 20 pounds at home" (R. 83). However, the medical record cited by the ALJ in support of this explanation states that Mr. Bradley "does use less than 20 pounds of upper body weights" for exercise (R. 83, 290). The ALJ interpreted Mr. Bradley's statement that he lifted "less than twenty pounds" as part of his home exercise program as evidence that he could lift "up to 20 pounds" occasionally. The Commissioner does not dispute that the phrase "less than twenty pounds" is not synonymous with the phrase "up to 20 pounds."

In any event, the ALJ's missteps in failing to give controlling weight to Dr. Glunz's standing and walking limitation of two hours per day and in rejecting Dr. Glunz's lifting limitation were harmless. We will not remand a case to the ALJ "if we can predict with great confidence that the result on remand would be the same." *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). As the Commissioner notes, if Dr. Glunz were correct in determining that Mr. Bradley were limited to standing or walking for two hours and sitting for six hours in a workday, it would not affect the outcome of this case. The VE testified that there were still sufficient jobs available for a person with a two-hour standing or walking and six hour sitting limitation (R. 37-39, 86). Consequently, even if the ALJ had adopted Dr. Glunz's two-hour standing/walking limitation, it would not have changed the result here. Likewise, even adopting Dr. Glunz's opinion that Mr. Bradley is "only able to lift up to 15 pounds" would not affect his ability to

perform any of the listed jobs--the VE testified that a limitation to lifting up to 15 pounds would not affect the ability to perform the significant numbers of jobs she identified (R. 38).

After discounting Dr. Glunz's opinion and affording "some weight" to Dr. Hawkins' opinion, the ALJ assigned "significant weight" to the RFC assessment of non-examining agency physician Dr. Wabner (and its affirmance by Dr. Aquino). The ALJ's explanation for why greater weight was given to the non-examining state agency physicians' opinions over the opinions of Drs. Glunz and Hawkins, who treated and examined Mr. Bradley, is unpersuasive. The ALJ summarily stated that the state agency physicians "had an opportunity to review the claimant's longitudinal treatment record, and their opinions are consistent with the objective medical evidence" (R. 83). But the ALJ did not identify the consistent objective medical evidence. The ALJ's conclusory statement with no indication of which portions of the medical evidence support the state agency opinions is not a sufficient basis for discounting the opinion of a treating physician and examining physician in favor of the opinion of a non-examining physician. *Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014) (holding that the ALJ's conclusory statement that the non-examining physician's opinion was "consistent with the record as a whole," when in fact it was contradicted, was not enough to justify elevating that opinion over all others); *Schmidt v. Colvin*, 545 Fed.Appx. 552, 557 (7th Cir. 2013) (holding the ALJ erred in giving great weight to the opinion of the non-examining state agency physician over that of a treating physician where the ALJ stated only that the opinion was "well[-]reasoned and consistent with the body of the evidence as a whole," and did not indicate which portions of the record might actually be consistent with the non-examining physician's opinion).

In addition, the record does not support the ALJ's conclusion that the state agency physicians had an opportunity to review Mr. Bradley's longitudinal treatment record. Drs.

Wabner and Aquino rendered their opinions on August 23, 2012 and December 4, 2012, respectively. The most recent treatment note in the record is from January 9, 2014. The Commissioner correctly points out that the "ALJ recognized . . . that the State agency consultants did not have the opportunity to review the most recent evidence or Bradley's testimony" when the ALJ reduced Mr. Bradley's RFC (Def.'s Br. at 6); (R. 83). Under these circumstances, the ALJ did not adequately explain why the state agency physicians' opinions deserved more weight than Drs. Glunz's and Hawkins' opinions, especially given that the state agency physicians did not review Mr. Bradley's most recent treatment records.

That said, once again, Mr. Bradley cannot show prejudice stemming from the ALJ improperly giving greater weight to the state agency physicians' opinions than Dr. Glunz's and Dr. Hawkins' opinions. The ALJ was not required to afford Dr. Hawkins' opinion greater weight because it provided no specific work-related limitations. Even if the ALJ gave more credit to Dr. Hawkins' opinion, the outcome would not change because Dr. Hawkins did not opine that Mr. Bradley's functional abilities were more restrictive than the ALJ found. Assigning greater weight to Dr. Glunz's opinion would also not have changed the result in light of the VE's testimony indicating that sufficient jobs would be available had Dr. Glunz's lifting and standing/walking limitations been adopted. Therefore, the ALJ's decision to assign greater weight to the non-examining state agency physicians without adequate explanation was harmless.

**B.**

Mr. Bradley next argues that the ALJ gave insufficient reasons for finding that his complaints about the severity of his impairments and the extent of his limitations were not fully credible. We give deference to the ALJ's credibility decision "[b]ecause the ALJ is in the best position to determine the witness's truthfulness and forthrightness . . ." *Shideler v. Astrue*, 688

F.3d 306, 301-11 (7th Cir. 2012) (internal quotation and citations omitted). "So long as an ALJ gives specific reasons supported by the record, we will not overturn his credibility determination unless it is patently wrong." *Curvin v. Covlin*, 778 F.3d 645, 651 (7th Cir. 2015). Courts "should rarely disturb an ALJ's credibility determination, unless that finding is unreasonable or unsupported." *Getch v Astrue*, 539 F.3d 473, 483 (7th Cir. 2008). Mr. Bradley offers several valid challenges to certain aspects of the ALJ's credibility determination, but we find that overall it is supported by substantial evidence.

Mr. Bradley contends that the ALJ erred in considering his receipt of unemployment benefits after his alleged onset date as adversely affecting his credibility. The ALJ's credibility assessment includes the statement that "[w]hile not dispositive, he also admit[ted] receiving unemployment benefits after the alleged onset date. In order to do so, he had to certify that he was willing and able to work, contrary to his assertions in this case" (R. 84). Receipt of unemployment benefits can be a legitimate ground for discounting a claimant's credibility under certain circumstances. *Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005) (rejecting the position that a "claimant's decision to apply for employment benefits and represent to state authorities and prospective employers that he is able and willing to work should play absolutely *no* role in assessing his subjective complaints of disability."). While an ALJ may "give some consideration to [an applicant's pursuit of unemployment benefits] when assessing his credibility, . . . attributing a lack of credibility to such action is a step that must be taken with care and circumspection. All of the surrounding facts must be carefully considered." *Scrogham v. Colvin*, 765 F.3d 685, 699 (7th Cir. 2014). The ALJ did not carry out a careful consideration of the surrounding facts in this case. At the hearing, Mr. Bradley's attorney stated that Mr. Bradley collected unemployment for a short period of time, but the ALJ asked Mr. Bradley no questions

about his pursuit of unemployment benefits (R. 16). The ALJ should have asked Mr. Bradley about the perceived inconsistency between his certification that he was willing and able to work and his subjective complaints of disability.

Mr. Bradley also claims that the ALJ selectively considered his daily activities, without mentioning limits on those daily activities. "An ALJ may not ignore a claimant's limiting qualifications with regard to [his] daily activities." *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010). Specifically, Mr. Bradley contends that ALJ erred by not mentioning that: (1) the food he warms up in the microwave is prepared by his girlfriend before she leaves for work, (2) he goes to the park with his girlfriend and daughter on "rare occasions," (3) he rarely drives and never drives on the expressway, and (4) he lifts less than twenty pounds (Pl's Br. at 9). As to the first item, the ALJ noted that Mr. Bradley testified that he warms up food in the microwave (R. 79). Regarding the second item, the ALJ did not err because Mr. Bradley did not testify that he accompanies his girlfriend and daughter to the park on "rare occasions." Mr. Bradley testified that "on the weekend, in the summertime, me and my girlfriend might take my daughter out to the park" (R. 28). As to the third item, the ALJ considered the qualification Mr. Bradley placed on his lifting ability, acknowledging that Mr. Bradley testified that he could lift only five to ten pounds (R. 79). Finally, the ALJ did mistakenly state that Mr. Bradley "acknowledged driving frequently" (R. 79). Mr. Bradley testified that he did not drive often, tried not to drive because it is uncomfortable and makes him nervous, and does not drive on the expressway (R. 27-28). However, contrary to Mr. Bradley's assertion, the ALJ did not equate Mr. Bradley's daily activities with an ability to work full-time but fairly concluded that Mr. Bradley's "testimony regarding the severity of his limitations appeared exaggerated when compared to the objective medical evidence" (R. 84). This evidence included doctors' notations that Mr. Bradley retained

full range of motion despite his left-side weakness, and spasticity and medical records showing only mild weakness on his left side (4 and 4+ out of 5 strength).

Mr. Bradley's other criticisms of the ALJ's credibility finding are without merit. Mr. Bradley argues that the ALJ erred in discounting his credibility because he attempted to return to work after his stroke. The ALJ properly considered Mr. Bradley's work history both before and after his alleged onset date. A "claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability." *Hill v. Colvin*, 807 F.3d 862, 868 (7th Cir. 2015). "But work history is just one factor among many, and it is not dispositive." *Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016). The ALJ found that Mr. Bradley's long and consistent work history and his attempt to return to work after his stroke showed a strong work ethic which bolstered his credibility (R. 83-84). But, the ALJ also found that Mr. Bradley's return to work for seven months after his stroke undermined his allegations of disabling impairments (R. 84). In determining that Mr. Bradley's return to work after his stroke suggested that he was less than credible with respect to his ability to work, the ALJ considered that his employer required him to perform fairly strenuous work requiring standing all day and stacking metal bars which weighed 30 to 45 pounds (*Id.*). The ALJ acknowledged that Mr. Bradley could no longer perform that work, but found that he could perform other, less physically demanding work (*Id.*). The ALJ did not err in determining that Mr. Bradley's ultimate inability to perform demanding physical work after his alleged onset date failed to support his claim of an inability to perform less demanding work. *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) (holding that the fact that the claimant "could perform some work cut[] against his claim that he was totally disabled" during the time period at issue).

Mr. Bradley next contends that the ALJ improperly discredited his symptom allegations based on his routine and conservative treatment and improvement with medication. The ALJ was entitled to discount the severity of Mr. Bradley's symptoms because of his routine and conservative treatment. *Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009) (noting that the Social Security regulations expressly permit the ALJ to consider the claimant's treatment history); *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005) (holding that the claimant's subjective complaints of disabling pain were not entirely credible where the claimant's treatment was "routine and conservative"); 20 C.F.R. § 404.1529(c)(3)(v). The ALJ noted that Mr. Bradley's treatment during the relevant period had been "routine and conservative, generally consisting of medication follow up appointments" (R. 84). The ALJ acknowledged that Mr. Bradley lost his health insurance when he was ultimately fired from his job in February 2013 (R. 84). However, the ALJ went on to note that Mr. Bradley was able to establish regular treatment at Mile Square Health Center after he lost his insurance coverage (*Id*).

Mr. Bradley argues that "it may well be true that treatment for a stroke is most intensive immediately after it occurs," but that his "comparatively routine and conservative treatment does not negative the severity of a chronic impairment or the degree of limitation suffered as a result" (Pl.'s Br. at 8). The ALJ addressed this contention, finding that Mr. Bradley's recent treatment records did not support the severity of his alleged symptoms (*Id*.). That finding is supported by substantial evidence. The ALJ noted that despite Mr. Bradley's left-sided weakness and spasticity, his doctors have noted full range of motion (*Id*). The ALJ also mentioned that while Mr. Bradley previously used a cane, more recent records did not reflect the need for an assistive device (*Id*.). The ALJ described in his credibility determination that Mr. Bradley's most recent treatment record from January 2014 reflected a pain rating of 0 out of 10 and gave no indication

that he needed an assistive device (*Id.*). The ALJ further noted that the record documents some left-sided weakness with Mr. Bradley's motor strength generally between 4 and 5+ [sic] out of 5 on the left side, but Mr. Bradley is right-handed (*Id.*).

We also note that when evaluating a claimant's credibility, the ALJ must consider the effectiveness of medication. *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004); SSR 16-3p, 2016 WL 1119029, at *7 (March 16, 2016). The ALJ found that Mr. Bradley's pain, spasticity and other symptoms decreased with the use of medication. Mr. Bradley's medical records support the ALJ's conclusion. The ALJ relied on Dr. Weingarten's October 4, 2012 report which indicates that Mr. Bradley's hypertension was now well controlled with medication (R. 642). The ALJ also cited Dr. Kapur's January 9, 2014 report which characterizes Mr. Bradley's hypertension as benign and notes that Mr. Bradley reported that he gets normal blood pressure readings at home when he takes his medication regularly (R. 678). Dr. Kapur further noted that Mr. Bradley stated that Gabapentin helps relieve the burning sensation on his left side and Mr. Bradley rated his pain level as 0 out of 10 (R. 678, 680). Given this record, the ALJ fairly concluded that Mr. Bradley's routine and conservative treatment and improvement with medication discounted the severity of Mr. Bradley's symptoms.

On balance, the errors in the ALJ's credibility determination are not enough to undermine the ALJ's bottom line finding that Mr. Bradley's claimed symptoms and limitations were not fully credible. *Simila v. Astrue*, 73 F.3d 503, 517 (7th Cir. 2009) (stating "[t]hough the ALJ's credibility determination was not flawless, it was far from 'patently wrong.'"). "Not all of the ALJ's reasons must be valid as long as *enough* of them are, and here the ALJ cited other sound reasons for disbelieving [Mr. Bradley]." *Halsell v. Colvin*, 357 Fed.Appx. 717, 722-23 (7th Cir. 2009). Because the ALJ's credibility determination overall was well supported and not patently

wrong, despite the errors identified above, any errors that the ALJ made do not warrant reversal. *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008) (stating "[i]t is only when the ALJ's determination lacks any explanation or support that we will declare it to be 'patently wrong.'").

## C.

We turn next to the ALJ's determination of Mr. Bradley's RFC. "The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). In this case, the ALJ found that Mr. Bradley could perform a reduced range of light work, including the ability to lift up to 20 pounds occasionally and up to 10 pounds frequently and to stand or walk for approximately four hours and sit for approximately four hours per eight-hour workday (R. 78). A sit/stand option was also included in ALJ's RFC (*Id.*) Mr. Bradley challenges the ALJ's RFC assessment on two grounds. Mr. Bradley first argues that the ALJ's RFC determination that he can stand or walk up to four hours in an eight-hour workday is not supported by substantial evidence in the record. Second, Mr. Bradley argues that the sitting and standing option in the RFC was "too vague to have elicited an accurate employment picture from the VE" (Pl.'s Br. at 13).

Mr. Bradley claims that the ALJ's finding that he could stand or walk up to four hours in a workday was erroneous because the ALJ used his own lay opinion to formulate a middle ground RFC that cannot be traced to any medical evidence in the record. An ALJ may not "play doctor" by making independent medical findings. *Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009). There was no medical opinion that Mr. Bradley could stand or walk up to four hours in a workday. The state agency physicians opined that Mr. Bradley could stand or walk up to six hours in a workday, and Dr. Glunz's opinion was that he had ability to stand or walk for two

hours in a workday. The ALJ then constructed a "middle ground" and determined that Mr. Bradley could stand or walk for four hours in a workday without an evidentiary basis.

ALJs "are not permitted to construct a 'middle ground' RFC without a proper medical basis. Additionally, under 96-8p, ALJs are required to explain how they arrived at their conclusions regarding claimant's RFC." *Norris v. Astrue*, 776 F.Supp.2d 616, 637 (N.D. Ill. 2011). Here, the ALJ made a specific stand and walk finding without any citation to the record for this finding. The ALJ's statement that he considered the "more recent evidence and the claimant's testimony" in finding that Mr. Bradley could stand or walk for four hours, without identifying any specific evidence, is too vague to allow a meaningful review and fails to support his decision with substantial evidence. We therefore conclude that in finding that Mr. Bradley could stand or walk for four hours in a workday without relying on any particular part of the record, the ALJ failed to create an accurate and logical bridge from the evidence to his conclusion. *Suide v. Astrue*, 371 Fed.Appx. 684, 690 (7th Cir. 2010) (holding the "record simply d[id] not support the parameters included in the ALJ's residual functional capacity determination," such as "an ability to 'stand or walk for six hours' in a typical workday."); *see also Barrett v. Barnhart*, 355 F.3d 1065, 1066-67 (7th Cir. 2004) (finding reversible error where the ALJ determined that the claimant could stand for two hours with no medical evidence to support such a conclusion). However, the ALJ's failure to point to evidence that explained why he included the four hour standing and walking limitation in the RFC is harmless because (as we explained above) the VE testified that a significant number of jobs could be performed even if Dr. Glunz's two hour standing and walking limitation had been adopted.

Mr. Bradley also claims that the sitting and standing option in the hypothetical was not sufficiently specific as to whether "it is up to Plaintiff alone to choose when and whether to sit or

stand throughout the entire day" (Pl.'s Reply at 8). This argument is without merit. Here, the ALJ specified in his hypothetical to the VE that the individual "would be allowed to alternate sitting and standing *at will*" (R. 34) (emphasis added). The ability to alternate positions at will "means the individual decides the frequency and duration of sitting and standing positions." *Collins v. Colvin*, 2015 WL7252533, at *17 (M.D.Pa.Nov.17,2015). The at will restriction provided sufficient information for the VE to restrict the occupation base to jobs that allowed the claimant to be able to choose to sit or stand when he feels it is necessary. *Ketelboeter v. Astrue*, 550 F.3d 620, 626 (7th Cir. 2008 (holding a sit/stand option where the claimant "could sit or stand as needed during the day" sufficiently specified the frequency and duration with which the claimant would have to sit and stand); *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007) (concluding RFC specifying claimant would be able to alternative between sitting and standing at claimant's "own option" was adequate).

### D.

Mr. Bradley's final argument is that the ALJ improperly relied on the VE's testimony without adequately resolving a conflict between the VE's testimony and the DOT. An ALJ is required to "investigate and resolve any apparent conflict between the VE's testimony and the DOT." *Weatherbee v. Astrue*, 649 F.3d 565, 570 (7th Cir. 2011); SSR 00-4p, 2000 WL 188704, at *2 (Dec. 4, 2000). "[B]ecause SSR 00-4p imposes an affirmative duty *on the ALJ* to inquire into and resolve apparent conflicts, a claimant's failure to raise a possible violation of SSR 00-4p at the administrative level does not forfeit the right to argue later that a violation occurred." *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008) (emphasis in original). Nevertheless, if a claimant's attorney does not identify the conflicts at the time of the hearing, then the plaintiff must show that "the conflicts were obvious enough that the ALJ should have picked up on them

without any assistance, for SSR 00-4p requires only that the ALJ investigate and resolve *apparent* conflicts between the VE's evidence and the DOT." *Id.* "When there is an apparent conflict, ALJs are required to obtain reasonable explanations for the conflict." *Weatherbee*, 649 F.3d at 570.

Mr. Bradley contends that the hypothetical presented to the VE contained a conflict because the ALJ determined that Mr. Bradley could perform a range of light level exertional work but restricted Mr. Bradley's ability to stand or walk to four hours in an eight-hour workday. The regulations define light work as requiring a "good deal of walking or standing," 20 C.F.R. § 404.1567(b). SSR 83-10 clarifies that a "full range of light work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday." SSR 83-10, 1983 WL 31251, at *6 (1983).

Given the applicable Social Security regulation and ruling, it is reasonable to infer that the ALJ recognized that Mr. Bradley's four-hour standing and walking restriction differed from the definition of light work which has a six-hour standing and walking restriction. We disagree with Plaintiff that the ALJ failed to inquire into and resolve the conflict. To resolve this conflict, the ALJ explicitly asked the VE "how much standing and walking" was involved in the cashier, storage facility rental clerk, and routing clerk jobs (R. 34). The VE confirmed that the three jobs in question did not require more than four hours of standing or walking (*Id*). The ALJ then asked the VE if her testimony was consistent with the DOT (R. 35). The VE answered that her testimony was consistent with the DOT, her professional experience, and job site observation (*Id.*). In response to a question from Mr. Bradley's attorney, the VE also added that an employee who was limited to only two hours of standing or walking in a workday would be able to perform the jobs of cashier, storage facility rental clerk, and ticket taker. The VE explained that the

cashier and ticket taker jobs can be accommodated with a person's need to sit and stand at will (R. 34, 39).

"An ALJ is free to accept testimony from a VE that conflicts with the DOT when, for example, the VE's experience and knowledge in a given situation exceeds that of the DOT's authors." *Overman*, 546 F.3d at 464. SSR 00-4p explains that "[n]either the DOT nor the VE or VS evidence automatically 'trumps' when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information." SSR 00-4p, 2000 WL 1898704, at *2. "Reasonable explanations for such conflicts, which may provide a basis for relying on the evidence from the VE or VE, rather than the DOT information, include . . . [i]information about a particular job's requirements ... from a VE's or VS's experience in job placement or career counseling." (*Id.*). Here, the ALJ obtained a reasonable explanation from the VE for the conflict between her testimony and the DOT and adequately resolved the conflict by relying on the VE's testimony based on her "professional experience in job placement and job site observation." (R. 35). Plaintiff does not explain why the VE's explanation that her assertions were based on her professional experience in job placement and job site observation is not a reasonable explanation for the portion of her testimony that was inconsistent with the DOT. We conclude that the ALJ did not err in relying upon the VE's testimony to find that Mr. Bradley was able to perform a limited range of light work.

## CONCLUSION

For the reasons stated above, we deny Mr. Bradley's motion for summary judgment (doc. # 9) and grant the Commissioner's motion for summary judgment (doc. # 11). This case is terminated.

**E N T E R:**

SIDNEY I. SCHENKIER
**United States Magistrate Judge**

**DATE: October 11, 2016**